## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JT CLEARY, INC., <br><br> Plaintiff, <br><br> v. <br><br> NARRAGANSETT ELECTRIC COMPANY d/b/a NATIONAL GRID PLC, <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **[DEMAND FOR JURY TRIAL]** |

Plaintiff JT Cleary, Inc. ("Cleary"), by and through its attorneys, Smith, Currie & Hancock LLP, states the following in support of its Complaint against Defendant Narragansett Electric Company d/b/a National Grid PLC ("National Grid"; together Cleary and National Grid are referred to as the "Parties").

### INTRODUCTION

1.  This case is brought to enforce Cleary's right to additional payments stemming from a contract ("Contract") with National Grid. The Contract required installation of HDPE pipe under the sea floor to allow National Grid to later install power cabling to an offshore green energy farm located in the Atlantic Ocean. The project is located on the shores of Block Island, Rhode Island, and was under time constraints due to its proximity to a beach. No work was allowed during the summer season.

2.  The Parties entered into a Contract on or around July 31, 2020, for the installation of underwater conduit installation.  A copy of the Contract is attached as Exhibit 1 and a copy of the incorporated terms and conditions are attached as Exhibit 2. Upon completion of the Contract on January 28, 2021, National Grid requested Cleary to change the work scope and terminate the

HDPE pipe approximately 6' below grade. Cleary orally and in writing advised against this change and only performed this work under protest due to concerns about dirt, mud, and sand infiltrating into the conduit if the seaward pipe was terminated 6' below the seabed.

3.   Cleary provided covers for the seaward end of the conduit to prevent the introduction of dirt, sediment, marine wildlife, and other potential obstructions. The landward site of the conduit terminated in a manhole vault. Cleary was not responsible for pulling the cables.

4.   Cleary performed several mandrel tests in accordance with the Contract requirements, the 3rd mandrel test was completed on January 31, 2021. A mandrel test involves pulling a plug through the HDPE conduit to insure there are no major blockages.

5.   Cleary performed the mandrel tests in accordance with the approved submittals as submitted to National Grid.

6.   While performing the last test, a storm arose that required Cleary to immediately cease its underwater operations, after 13 of the 16 bolts on the flange were installed. The installed 13 bolts sufficiently sealed the flange to keep sediment and marine life from entering the conduit.

7.   On or around February 5, 2021, National Grid approved the cap after 13 of the 16 flange bolts were installed. As of February 5, 2021, the conduit was ready for cable installation by National Grid.

8.   After Cleary received approval, on or about April 9, 2021 (70 days after approval) another contractor for National Grid made substantial revisions to Cleary's work, including removing the cap installed by Cleary and replacing the seaward flange cap with a different apparatus.

9.   Months after National Grid accepted Cleary's conduit and directed changes from another contractor, the contractor performed their own procedure to re-mandrel the HDPE pipe again prior to commencing their cable pulling operation. Their mandreling procedure was not successful

because of alleged blockages in the conduit. National Grid directed Cleary to return to the site and flush the pipe to remove any material that entered the conduit after another contractor had removed the original cover and had attempted their own mandrel process.

10. Cleary expended significant resources to flush the conduit in the area of the presumed blockage removing some sands. This work was performed 70 days after National Grid accepted responsibility for the conduit. Despite repeated efforts, National Grid has refused to compensate Cleary for these expenditures.

11. Cleary incurred significant standby and delay costs due to lack of direction and coordination by National Grid while waiting for National Grid to install the cable.

12. Cleary is entitled to recover $3,083,887.00 from National Grid for its breaches of the Contract documents and wrongful withholding of funds, plus interest and attorneys' fees as allowable by law.

## JURISDICTION AND VENUE

13. The Court has diversity jurisdiction under 28 U.S.C. 1332 because the Parties are diverse and the amount in controversy exceeds $75,000.

14. Venue is proper under 28 U.S.C. 1391 because National Grid is subject to the Court's personal jurisdiction. Venue is also proper as the Parties consented to dispute resolution in any Court in New York as part of their Contract.

## PARTIES

15. Plaintiff Cleary is a New Jersey corporation with its principal place of business in New York.

16. Upon information and belief, Defendant National Grid is a Massachusetts corporation with its principal place of business in Rhode Island.

## FACTUAL BACKGROUND

17. On or around July 31, 2020, the Parties entered into a Contract to install and bury HDPE conduit under the seafloor off the shores of Block Island, Rhode Island.

18. Cleary's scope of work was to bury the HDPE conduit starting at a manhole vault, go under a beach and seafloor, and then terminate the HDPE conduit in the ocean.

19. The oceanside of the conduit was to receive a flange and cap to prevent infiltration of debris, including mud and marine life, that would interfere with the eventual cable pulling and clog the pipe.

20. Cleary was not responsible for pulling the cable. The cable pull work was performed by another subcontractor working directly for National Grid.

21. Prior to releasing the conduit to National Grid, Cleary was to perform a mandrel test pursuant to Section 22200 Part 2 of the specifications.

22. The mandrel is smaller than the inner pipe diameter and is used to ensure that there are no significant obstructions in the conduit prior to handoff.

23. After pulling the mandrel through the conduit, the mandrel is inspected for gouges or damage to determine whether obstructions exist.

24. The Contract required that upon completion and approval of the mandrel pull, Cleary would then cap the seaward side of the conduit and then release the completed work to National Grid.

25. Power Engineers, the designer for National Grid, issued RFI NG-001, which reconfigured the 16" conduit.

26. The reconfiguration changed the termination of the seaward end of the conduit to approximately 6' below the seabed to allow for a transition to direct buried cable.

4

27. Cleary alerted National Grid to a number of issues with the revision, including that the revision deviated from the standard methodology to terminate the conduit. Cleary stated that it could not warrant that this design would be successful. Cleary also warned that anticipated adverse weather could compromise the performance of the changed work.

28. National Grid directed Cleary to perform. Adverse weather impacted the project, requiring Cleary to demobilize due to safety concerns.

29. To avoid the impending storm, Cleary had installed thirteen of the sixteen bolts on the flange cap at the seaward end of the conduit which provided a weather tight seal. As shown on the approved as-built drawings, the flange seal was tight with no gaps. The installation was approved by National Grid.

30. Cleary performed the work (including the 13-bolt installation) and completed a successful mandrel test on January 31, 2021.

31. As of January 31, 2021, Cleary had completed its work and the conduit was in the sole possession and custody of National Grid.

32. On April 9, 2021, Cleary received an email alleging that there were obstructions in the conduit that prevented the cable from being installed.

33. On April 10, 2021, National Grid directed Cleary to remobilize and clean the conduit. Cleary confirmed it would remobilize with the understanding that it would be compensated.

34. National Grid directed Cleary to proceed with the work and submit a completed change request for review and approval.

35. By April 13, 2021, Cleary had mobilized to clear the conduit.

36. Cleary began jetting the conduit to clear the alleged blockage.  Cleary made multiple passes past the location of the alleged blockage and encountered no resistance. National Grid stopped these efforts when a significant amount of water accumulated in the manhole.

37. Starting on April 15, 2021, Cleary notified National Grid that it was on standby and had no additional work to perform until it received direction from National Grid.

38. On April 19, 2021, National Grid alleged that Cleary had breached the warranty and that National Grid would utilize another contractor to perform the work. National Grid's sole basis was that there was an alleged obstruction found on April 9, 2021, and that "there could be more."

39. Cleary immediately responded, reminding National Grid of the concerns Cleary had raised about the design revision leaving the seaward end 6' underground (increasing the risk of infiltration of mud and debris) and that National Grid had been in sole possession of the conduit since January 31, 2021, after the conduit had passed multiple mandrel pulls.

40. Cleary also raised that there was no defect in the pipe or the work that would trigger any warranty obligations.

41. National Grid, utilizing the cable installer LS Cable System of American, In. ("LSCSA"), subsequently diverged from the Contract requirements and ran a puffy mandrel through the conduit. Unlike a metal mandrel that is sized significantly smaller than the inner conduit diameter, a sponge or puffy mandrel expands to fill the entire conduit.  The puffy mandrel was not required by the specifications.

42. The puffy mandrel gathers all debris and sediment in the water inside the conduit and consolidates it, creating blockages and enforcing a cleanliness standard within the conduit that was not included in the Contract documents.

43. Additionally, LSCSA, by taking the seaward endcap off for pulls, introduced debris into the conduit each time it prepared to pull cables.

44. Cleary was not provided notice that this work was being done, an opportunity to observe the work performed, or a chance to perform the work itself.

45. On April 28, 2021, Cleary provided another notice of suspension of its work caused by LSCSA completing its work.

46. On June 9, 2021, Cleary prepared a detailed letter to National Grid addressing the ongoing issues. This letter again indicated that Cleary's work complied with the Contract requirements A small amount of sand left in the pipe was acceptable in accordance with Contract and industry standards and that the small amounts of sand would not harm the armored cable.

47. From June, 2021 onwards, Cleary attempted on numerous occasions to observe the alleged cleaning work performed by National Grid. Each time, National Grid barred Cleary from witnessing pipe operations or provide any evidence of alleged obstructions.

48. Cleary subsequently learned that National Grid had replaced the flange cap on the seaward side with a different cap at some point after Cleary handed over the conduit on January 31, 2021.

49. Cleary incurred significant costs as a result of the unreasonable requirements of National Grid. These costs include Contract Work Invoice #7 in the amount of $577,628.10; Change Order 1 for "additional work Dyneema Rope" in the amount of $9,264.65; Change Order 2 for "additional work to attempt clearing of HDPE" at the direction of National Grid in April 2021 in the amount of $143,168.74; Change Order 3 for "Weather delay costs per contract" approved by National Grid and valued at $1,070,208.00; and release of retainage for Contract work performed in the amount of $1,283,618.00; for a total due of $3,083,887.49.

50. Cleary has satisfied the contractual prerequisites before bringing this lawsuit.

## COUNT I – BREACH OF CONTRACT

51. Sections 14 and 15 of the Contract require National Grid to issue change orders for directed changes.

52. National Grid directed Cleary to perform work in addition to the base scope, including additional cleaning attempts of the conduit after National Grid had taken possession.

53. National Grid directed Contract changes that it has yet to pay for, including requiring Dyneema Rope instead of the rope required by the Contract.

54. Cleary also incurred additional costs for standby costs due to delays from other contractors and weather delays that it is permitted to recover under the Contract but that National Grid has refused to pay.

55. National Grid also directed Cleary to remobilize and remain on standby to perform added scope work related to the additional cleaning.

56. National Grid's directives to perform additional work also forced Cleary to encounter additional adverse weather after National Grid accepted the conduit.

57. Despite these directives, National Grid has refused to make outstanding payments or issue change orders to cover the additional costs for out-of-scope work performed by Cleary.

58. National Grid also failed to pay outstanding Contract invoices for base scope amounts and to release retainage owed to Cleary.

59. Cleary is entitled to payment of $3,083,887.49 plus interest.

## COUNT II – BREACH OF CONTRACT – OVERINSPECTION

60. National Grid breached its Contract with Cleary by imposing excessively stringent inspection and cleanliness standards that exceeded the requirements of the Contract.

61. Cleary incurred damages as a result of this over inspection and excessively stringent standard.

62. These damages include the improper withholding of payment for Cleary's Contract invoices.

63. The damages also include the wrongful withholding of retention after Cleary finished its work.

64. The over inspection forced Cleary to incur substantial costs reperforming cleaning and mandrel work on the HDPE pipe to meet a standard well beyond that specified in the Contract and adopted by the industry.

65. The over inspection caused significant delays during which time Cleary was forced to continue paying for equipment and labor but was unable to utilize it.

66. Cleary is entitled to recover $3,083,887.49 incurred as a result of this excessive inspection.

## COUNT III – CONSTRUCTIVE CHANGE

67. National Grid constructively changed the Contract by directing Cleary to perform additional work outside the scope of the Contract.

68. This work included additional amounts to change materials, delay damages resulting from actions from National Grid and its other contractor, perform additional cleaning, and to incur standby costs for weather days during extra-contractual performance.

69. Cleary performed this work and incurred additional costs due to National Grid's directive.

70. Cleary is entitled to be compensated for this additional work in the amount of $3,083,887.49.

## COUNT IV – QUANTUM MERUIT/UNJUST ENRICHMENT

71. By providing additional labor, materials, and equipment at National Grid's request, National Grid accepted and received a benefit from Cleary.

72. This included additional costs for changed work, delays, and standby costs.

73. In addition, National Grid accepted the benefits of its Contract with Cleary, including use of a HDPE conduit, and yet has failed to pay outstanding Contract balances and retainage.

74. National Grid's withholding of the Contract balance and refusal to pay for the costs associated with the changes deprives Cleary of compensation for the fair value of its services.

75. Cleary is entitled to recover the reasonable value of the benefit conferred to National Grid for the additional scope work performed.  That reasonable value is at least $3,083,887.49.

## COUNT V – BREACH OF THE NEW YORK PROMPT PAY ACT

76. The Contract mandates that New York law govern any disputes between the Parties.

77. The project in question exceeds the statutory minimums.

78. The New York Prompt Pay Act applies to this project.

79. Cleary properly invoiced National Grid for Invoice #7 and for its retainage.

80. Despite receiving invoices and supporting information, National Grid has refused to make payment to Cleary for the outstanding amounts.

81. National Grid breached the New York Prompt Pay Act by failing to timely make payments to Cleary.

82. National Grid's failure to make timely payments entitles Cleary to interest at 1% per month until payment is received.

## PRAYER FOR RELIEF

Wherefore, Plaintiff JT Cleary, Inc. hereby demands judgment in its favor and against

Defendant Narragansett Electric Company d/b/a National Grid PLC as follows:

A. For compensatory damages in the amount of $3,083,887.49 for National Grid's breach of
   Contract and Causes of Action one through four;

B. For compensatory damages in the amount of the reasonable value of the benefit conferred to
   National Grid for the additional scope work performed;

C. For an Order declaring JT Cleary, Inc is entitled to:

   i.   Payment of at least $3,083,887.49;

   ii.  Prompt Payment Penalties in the amount of 1% per month from the date amounts were due
        and owing; and

   iii. The reasonable value of the benefit conferred to National Grid for the additional scope
        work performed.

D. An award of Cleary's costs and reasonable attorney's fees; and

E. For such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, JT Cleary, Inc. hereby demands a trial by jury on all issues so triable of right.

Dated: June 1, 2022

SMITH, CURRIE & HANCOCK, LLP

By: _____
Karl Dix, Jr.
New York Bar No. 1908235
SDNY Bar ID KD3235
2700 Marquis One Tower
245 Peachtree Center Ave. NE

11

Atlanta, GA 30303-1227
Telephone: (404) 582-8038
Facsimile: (404) 6787-0671
Email: kfdix@smithcurrie.com

*Attorneys for Plaintiff, JT Cleary, Inc.*

12